**Nancy C. LOUCKS, Plaintiff,**

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, Defendant.**

**No. 1:04–CV–124.**

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 1, 2004.

Mark E. Brouwer, Brouwer Law Firm, PLLC, Grand Rapids, MI, for Plaintiff.

James P. Hollihan, Duane Morris, LLP, Pittsburgh, PA, for Defendant.

### OPINION

ENSLEN, District Judge.

*Caveat Emptor!* This case attests to a promise bought and a promise broken. The vendor of disability insurance now tells us, with some legal support furnished by the United States Supreme Court, that a woman determined disabled by the Social Security Administration because of multiple disabilities which prevent any kind of work cannot be paid on the disability insurance she purchased through her employment. The plan and insurance language did not say, but the world should take notice, that when you buy insurance like this you are purchasing an invitation to a legal ritual in which you will be perfunctorily examined by expert physicians whose objective it is to find you not disabled, you will be determined not disabled by the insurance company principally because of the opinions of the unfriendly experts, and you will be denied benefits. Fortunately, the law, though left moribund by the Supreme Court's legal interpretations, does not allow the purveyor of such empty promises to win the day.

### BACKGROUND

This case concerns the claim by Plaintiff Nancy C. Loucks to compel payment of disability insurance benefits pursuant to section 502 of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132. (Compl., at ¶¶ 1–3.) As part of Plaintiff's employment with Steelcase, Inc., Plaintiff purchased disability benefits. Plaintiff was a long-term employee who worked approximately 15-years for Steelcase, Inc. as an administrative sales assistant. (Compl., at ¶ 7.)

The fiduciary or administrator for the disability benefits is Defendant Liberty Life Assurance Company of Boston. In that role, Defendant prepared the pertinent group disability insurance income policy which provided, in pertinent part, that Defendant had discretion to interpret the policy language and to make benefit determinations under the policy language. (Administrative Record ("A.R.") at 35.) Defendant also defined "disability" as "the inability to perform the usual duties of Any Occupation [1] or any other suitable job that meets [her] restrictions, or for Any Occupation for which he is or may reasonably become qualified based on [her] education, training or experience." (A.R. at 7.) [2]

Plaintiff has a long and successful history of work despite multiple illnesses. In the 1990s, she began experiencing chronic headaches, fatigue, dizziness, nausea, dry eyes, weakness, multiple muscle and joint pain, and difficulty sleeping. Multiple tests were conducted to rule out treatable illnesses, but Plaintiff's condition continued to deteriorate. Plaintiff was regularly treated by Dr. Peter Zadvinskis, a rheumatologist, who diagnosed her as suffering from fibromyalgia, consistent with the diagnostic criteria of the American College of Rheumatology.[3] She was also regularly

---

1. The terms "Any Occupation" are capitalized as defined terms under the policy. (*See* A.R. at 6.)

2. The policy also includes a less stringent definition of disability for an initial "Elimination Period"—which definition is not at issue in this suit.

3. See F. Wolfe, H.A. Smythe, M.B. Yunus, R.M. Bennett, C. Bombardier, D.L. Goldenberg, P. Tugwell, S.M. Campbell, M. Abeles, P. Clark, et al., The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee, 33 Arthritis & Rheumatism 160–72 (1990). Plaintiff meets these criteria in that she had well documented

treated by specialists for the chronic conditions of osteoarthritis and dry eyes. She also took prescription medication for chronic depression.

Plaintiff became unable to work in March 2000 and applied for disability benefits. She was paid initial disability benefits by Defendant since she could not perform the duties of her own occupation as determined by Defendant on October 19, 2000. (A.R. at 754.) The disability payments were set at 70 percent of her earnings less any social security benefits. (*Id.*) Plaintiff was not receiving social security benefits at that time.

Plaintiff had a functional capacity assessment performed in February 2001 to assess her ability to work any occupation. The results of that assessment and the physician records of her regular rheumatologist, Dr. Zadvinskis, demonstrated that she was completely disabled to perform any occupation. (A.R. at 711–24.) Defendant approved payment of long term disability benefits based on Plaintiff's medical condition at the time. (A.R. at 708–11.) She was again advised by Defendant concerning social security benefits. (A.R. at 709.)

Notwithstanding that determination, on July 6, 2001, a business analyst for Defendant recommended that Defendant's claim be subject to further documentation and possible peer review. (A.R. at 701.) Interestingly, this recommendation was qualified in that "if results indicate SS [social security] assistance, we do not recommend a referral at this time." (*Id.*) Further, medical documentation was requested from Plaintiff by the claims manager and was provided to Defendant. (A.R. at 640–45, 695–700.) The information provided by

Plaintiff confirmed that her disabling conditions had worsened. (A.R. at 640–45, 649, 656, 662–63.) It was also confirmed that she was applying for social security disability benefits.

At the behest of Defendant, Plaintiff was examined on June 21, 2002 by a licensed internist, Shlomo S. Mandel, M.D. Plaintiff was 54 years old at the time of the exam. Dr. Mandel had no specialization in either rheumatology, ophthalmology, or psychiatry. Following the exam, Dr. Mandel dictated a letter concerning Plaintiff's examination, though the record indicates that Dr. Mandel never read the dictated letter to determine whether it was an accurate dictation or whether he agreed with what he had dictated. (A.R. at 458–68.) The letter describes an examination of Plaintiff, but only in very general terms (most of the details seem borrowed from other medical records). The letter does contain general negative findings purportedly based on physical examination, but the findings are consistent with either a cursory examination and/or the use of rote language. Plaintiff herself expressed concern to Defendant that the examination only lasted five minutes. (A.R. at 103, 147.) The letter fails to document the length of the examination. Dr. Mandel's letter expressed a very general diagnosis concerning fibromyalgia and osteoarthritis, and considered Plaintiff's other disabling conditions as pertinent only to past medical history. (*See* A.R. at 458, 468.) Dr. Mandel's letter did not explicitly consider the American College of Rheumatology's criteria for fibromyalgia.

Defendant also commissioned another physician in Dr. Mandel's same office, Na-

widespread pain of long duration and sensitivity upon digital palpation at the requisite number of tender points (11 of 18). Plaintiff also suffers from a number of associated clinical symptoms (migraines, sleeplessness, de-

pression and fatigue). *See also* Social Security Ruling 99–2p, Evaluating Cases Involving Chronic Fatigue Syndrome, 64 F.R. 23380 (April 30, 1999).

tional Medical Evaluation Services, to perform a record review of a portion of Plaintiff's medical records. Stanley Sczecienski, D.O., conducted this review, which review omitted some medical records pertinent to her eye condition and chronic muscle and joint pain, including some important documentation by Dr. Zadvinskis. Dr. Sczecienski is not a specialist in rheumatology, ophthalmology, or psychiatry. He examined an incomplete set of Plaintiff's medical records and reported a general finding as to fibromyalgia and osteoarthritis (to the effect that he concurred with Dr. Mandel's findings). He did not factor into his diagnosis and prognosis any analysis of Plaintiff's other conditions (including her eye condition and depression). (A.R. at 448–49.) Dr. Sczecienski's letter did not explicitly consider the American College of Rheumatology's criteria for fibromyalgia.

Defendant denied Plaintiff's claim for benefits by letter of July 17, 2002. Said denial was premised on the opinions of Dr. Mandel and Dr. Sczecienski. (A.R. at 436–39.)

Plaintiff timely appealed the denial of benefits for further administrative review by letter of July 22, 2002. (A.R. at 123, 126.) In the process of doing so, Plaintiff reviewed the administrative file and learned that Defendant had mistakenly described her medical condition in its internal administrative records, including by making multiple records that Plaintiff suffered from possible HIV (which descriptions were simply inaccurate). (A.R. at 50, 52, and 53.) Defendant's explanation of this anomaly was that there were numerous "typographical errors." (A.R. at 100.)

Plaintiff's claim for social security disability was denied on August 9, 2002 by an Administrative Law Judge of the Office of Hearings and Appeals of the Social Security Administration. (A.R. at 207–20.) Plaintiff informed Defendant of the decision by letter of August 19, 2002. (A.R. at 206.) Her letter further indicated that she had requested an appeal to the Appeals' Council. (*Id.*) In particular, she challenged the Administrative Law Judge's reading of the record that her current (as opposed to past activities) included golfing. Her social security appeal was successful and resulted in an award of benefits in August 2003, which award included past due benefits since September 2000. (Pl.'s Mot. for Entry of J., Ex. A.)[4]

Plaintiff then provided Defendant further medical records, including a second functional capacity assessment of October 2002. (A.R. at 277–87.)

Following the receipt of this information, Defendant had a third physician, Gale G. Brown, Jr., M.D., evaluate Plaintiff's disability claim appeal. Dr. Brown's opinion supported that Plaintiff suffered from fibromyalgia meeting the criteria of the American College of Rheumatology. (A.R. at 190.) The opinion noted that this diagnosis was supported by the examinations and opinions of both Dr. Zadvinskis and Dr. Jean Thomas, another rheumatologist. (*Id.* at 201–04.) Dr. Brown's opinion further supported that Plaintiff had many limitations relating to both fibromyalgia and ophthalmic conditions—limiting her to certain varieties of sedentary work. Dr. Brown did, however, recommend that Plaintiff's claim be denied based on a determination that Plaintiff

---

**4.** This Court has considered Exhibit A, which is not part of the administrative record, because it tends to demonstrate a due process problem—an exception under *Wilkins, infra.* In other words, the evidence tends to demonstrate that the claims analysis was result-ori-

ented and biased. However, even if Exhibit A were not considered, it would not alter the Court's conclusion that the administrative record by itself demonstrates that the denial of benefits was arbitrary and capricious.

had reported activities which were inconsistent with disabling limitations. (A.R. at 302.) In this respect, Dr. Brown's opinion appears to have borrowed an error from the Administrative Law Judge's findings. The administrative record of this claim, itself, demonstrates this error in that there is a notation that medical records had been corrected to reflect that Plaintiff was a *formerly* avid golfer who is now unable to golf. (A.R. at 151.) Dr. Brown's findings also noted correspondence and documentation of Plaintiff's "dry eye" ophthalmic condition, but ignored the opinions of two ophthalmologists (Dr. Crawford and Dr. Schultz) that Plaintiff's eye condition was inconsistent with sedentary work, including office work. (A.R. at 290, 368, 381–82.) By letter of January 10, 2003, Defendant denied Plaintiff's administrative appeal. The denial was again based on Dr. Mandel and Sczecienski's findings and did not explain Dr. Brown's contrary findings.

The instant action was then filed on February 23, 2004 challenging the benefit determination as arbitrary and capricious under ERISA.

### ERISA LEGAL STANDARDS

Judgment motions in ERISA cases are not controlled by the regular summary judgment standards. Rather, the district court must apply an "arbitrary and capricious" standard of review to an ERISA plan administrator/fiduciary's decision regarding benefits when the plan provides the administrator/fiduciary with discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the instant case, the plan/insurance language provided this authority to Defendant. (A.R. at 35.) Thus, the decision of the administrator must be upheld provided that it was the result "of a deliberate, principled reasoning process and [was] supported by sub-

stantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds,* 929 F.2d 1140, 1144 (6th Cir.1991). This review is not abject, though, and "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western–Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir.2003). *See also Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir.2001); *Gallo v. Amoco Corp.,* 102 F.3d 918, 922 (7th Cir. 1996).

In conducting this review, the review is generally limited to the administrative record. Summary judgment standards are also not to be employed. The process was explained by the Sixth Circuit Court of Appeals in *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 618–19 (6th Cir. 1998) (J. Gilman, concurring). The concurring opinion of Judge Gilman, which was joined by Judge Ryan, was the opinion of the Sixth Circuit as to the manner of administrative record review of ERISA benefit determinations.

Judge Gilman wrote:

1. As to the merits of the action, the district court should conduct . . . review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.

2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehear-

ing discovery at the district court level should be limited to such procedural challenges.

3. For the reasons set forth above, the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.

*Id.* at 619.

Furthermore, according to the Supreme Court, these kind of benefit determinations are not limited by the treating physician rule which is applicable to social security disability determinations. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (U.S.2003). The Supreme Court held in *Black & Decker* that although a plan administrator many not arbitrarily refuse to credit opinions of a treating physician, such opinions are not entitled to any special weight, nor is a plan administrator required to specifically address them in making a benefit determination. *Id.,* 123 S.Ct. at 1972.

## *LEGAL ANALYSIS*

While a claim administrator and the independent physicians of the claim administrator need not specifically address the opinions of a treating physician, the administration of the claim must be principled, unbiased and above abject standards. In this case, the claim administration failed to meet even those basic standards.

First of all, the claim administration displayed was unprincipled, bias and craven. As can be seen readily from the claim history, this claim was not selected for review because of questions about Plaintiff's ability to work. The claim was initially paid precisely because there was little question that Plaintiff was disabled at the time. It was later selected for review because Plaintiff had not yet qualified for social security benefits—meaning that Defendant's liability exposure was much greater given that those benefits could not be offset against the promised disability payments. To say otherwise is to simply ignore the record of claim administration. The claim administrators not only failed to appreciate the significance of the medical findings of Plaintiff's treating specialists, they defamed Plaintiff by inaccurately labeling her an HIV patient and thereby completely misunderstanding her claim status. The claim administration was both grossly negligent and driven by financial motives irrespective of the binding contract/benefit language.

Apart from the unprincipled nature of the claim administration, the claim analysis was flatly wrong and the product of grossly deficient analysis. Defendant relied chiefly on the opinions of Drs. Mandel and Sczecienski. Only one of these physicians, Dr. Mandel, conducted any examination and that examination (five minutes long) was so fleeting that it was purposeless. Those physicians failed to appreciate (or even mention) the diagnostic criteria for fibromyalgia. They failed to consider other limiting conditions of Plaintiff—chronic dry eyes, depression, and osteoarthritis. They ignored the opinions of specialists who regularly treated Plaintiff, including three physicians (Drs. Zadvinskis, Thomas and Crawford), who had opined in favor of disability. The claim administration also failed to consider evidence in the record that Plaintiff could no longer participate in golfing and other leisure activities. There was no substantial evidence to support the conclusions of Defendant that Plaintiff did not suffer from fibromyalgia and other chronic conditions which, when considered together, disabled her from any occupation by any reasonable standard. This case is similar to the Sixth Circuit's recent decision in *McDonald* in which the Circuit reiterated that "arbitrary and capricious" review is not a rubber stamp for any decision of the claim administrator. *McDonald,* 347 F.3d at 172. In *McDonald,* as in this case, there was an independent

medical review which unreasonably disregarded the opinions of treating physicians and lacked a rational basis for a finding other than disability. *Id.* at 170–72; *see also Finazzi v. Paul Revere Life Ins. Co.,* 327 F.Supp.2d 790, 794 (W.D.Mich.2004). Although this Court regularly upholds claim determinations under the "arbitrary and capricious" standard, in this case the claim administration was precisely that.

### *CONCLUSION*

Accordingly, Plaintiff's Motion for Entry of Judgment shall be granted, Defendant's Motion denied, and Judgment shall enter determining that long term disability benefits are due to Plaintiff and remanding this matter to Defendant Liberty Life Assurance Company of Boston for the payment of those benefits in accordance with 29 U.S.C. § 1132(a)(1)(B).

### *JUDGMENT*

In accordance with the Opinion of this date;

**IT IS HEREBY ORDERED** that Plaintiff Nancy C. Loucks' Motion for Entry of Judgment (Dkt. No. 22) is **GRANTED** and Defendant Liberty Life Assurance Company of Boston's Motion for Entry of Judgment (Dkt. No. 20) is **DENIED.**

**IT IS FURTHER ORDERED** that Judgment is entered in favor of Plaintiff and against Defendant declaring that long term disability benefits are due and owing under Defendant's policy of insurance, and this matter is remanded for the award of those benefits.

**IT IS FURTHER ORDERED** that Plaintiff may seek attorney fees in accordance with Federal Rule of Civil Procedure 54(d) and may bill costs in accordance with W.D. Mich. L. Civ. R. 54.1.